UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

THADD TAYLOR                                                      CASE NO. 10-50039

DEBTOR


PEOPLES EXCHANGE BANK                                             PLAINTIFF

v.                                                                ADV. NO. 10-5036

THADD TAYLOR                                                      DEFENDANT


### MEMORANDUM OPINION

A primary purpose for an individual filing for bankruptcy protection is for the individual to obtain a discharge of his debts. Although a debtor may obtain such a discharge, some debts may be excepted from the bankruptcy court's discharge order. Section 523 of the Bankruptcy Code provides a list of such exceptions. In this adversary proceeding, Peoples Exchange Bank ("PEB") seeks a determination that its claim against the Debtor, Thadd Taylor (the "Debtor"), is nondischargeable based upon section 523(a)(2)(A) for fraudulent representations and section 523(a)(6) for willful and malicious injury to PEB.

The Debtor filed a motion for summary judgment which the Court denied after a hearing on November 3, 2010, having determined genuine issues of material fact existed and that testimony was needed to determine the claim of fraud. The trial proceeded on November 9, 2010, during which the parties presented evidence and offered testimony from the Debtor and a representative of PEB. Following the trial, the Court took this matter under submission. Having heard the witnesses at trial and reviewed the record, and otherwise being fully informed, the Court finds that the Debtor did not violate section 523(a)(2)(A) when he received money or a renewal or refinancing of credit from PEB, but he did violate section 523(a)(6) when he failed to remit sale proceeds to PEB in

1

contravention of the parties' security agreement. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

I.

The issues in this matter arise from several transactions between the parties. During the course of their dealings, the Debtor executed and delivered a note to PEB on February 14, 2007, for a principal sum of $174,639.98 (the "Cattle Note"). The Cattle Note provided for four annual payments of $53,912.58 due on each February 14th beginning on February 14, 2008. The Cattle Note was a renewal of previous notes, and the parties had been involved in financing agreements since 2002. To secure payment of the Cattle Note, the Debtor also executed and delivered to PEB a security agreement which provided a lien on farm equipment and 155 head of mixed breed cattle.

The Debtor, however, did not make the full annual payments under the note. Rather, he made two interest payments. The first payment came due on February 14, 2008, the Debtor did not make a payment at this time, but did make an interest payment on March 17, 2008 of $2,583.00. When the next payment came due on February 14, 2009, the Debtor again failed to pay. On May 29, 2009, however, he made an interest payment of $1,853.49. Finally, on September 31, 2009, the Debtor told PEB that he had sold all of his cattle and that he could only pay $18,500.00 on the note. The $18,500.00 payment was made. The Debtor therefore made payments totaling $22,936.49 on the Cattle Note.

PEB filed suit against the Debtor in the Clark County Circuit Court for the remaining amount due under the Cattle Note, as well as for amounts due under two other notes which are not subject to this adversary proceeding. After the Debtor did not appear or file an answer, PEB obtained a default judgment against the Debtor for $198,640.13 for the three notes.

The Debtor filed his Chapter 7 petition on January 8, 2010. On the date of the Debtor's bankruptcy petition, the amount due and owing on the Cattle Note was $178,490.11. PEB commenced this adversary proceeding by filing a complaint alleging nondischargeability on April

2

8, 2010. PEB claimed its debt was nondischargeable because the Debtor had sold the 155 head of cattle without paying PEB the sale proceeds. PEB alleges that the Debtor obtained money through intentionally fraudulent misrepresentations, and willfully and maliciously injured PEB by not remitting the sale proceeds.

II.

At trial, Richard Browning, a Senior Loan Officer for PEB, testified on behalf of PEB. Mr. Browning began working at PEB in early 2008, so he did not have personal knowledge of PEB's dealings with the Debtor prior to that time. He was, however, in charge of the Debtor's loan file and familiar with it.

Mr. Browning testified that the Debtor began his relationship with PEB in 2002, and that he had executed and delivered at least three promissory notes to PEB from 2002 until 2007. On February 14, 2007, the Debtor came to PEB to consolidate three promissory notes into the Cattle Note. Mr. Browning also testified that the first payment on the Cattle Note was not made because the Debtor told PEB that market conditions were not good for the sale and he needed the sale proceeds to fund his farm operation. The Debtor did, however, make an interest payment on the Cattle Note. Mr. Browning testified that when the subsequent payment came due in February 2009, the Debtor again did not make a payment due to poor market conditions and a need for the sale proceeds to fund his farming operation.

On cross examination, Mr. Browning acknowledged that a PEB Renewal/Refinance Processing Request dated May 29, 2009 noted that the Debtor could not make his current payment, and that the note was renewed for six months to give the Debtor time to liquidate assets and pay off PEB. On this date the Debtor made an interest payment of $1,853.49, but at no point did he represent that he was liquidating his cattle at that time. During the course of his testimony, Mr. Browning claimed that the Debtor represented to PEB in September of 2009 that he had liquidated all of his cattle and that he only had $18,500.00 that he could pay PEB for the Cattle Note.

On direct examination, the Debtor testified he regularly had trouble making payments on his loans with PEB. He also testified that he used the proceeds from the cattle sales to pay his farming

expenses before remitting any proceeds to PEB, and that PEB never indicated that he had to remit 100% of the proceeds. The Debtor maintained that none of the final sales proceeds from the cattle went to himself, but that it only went to farming expenses or to PEB for the Cattle Note.

On cross examination, counsel for PEB detailed the significant amounts of money spent by the Debtor from 2007 until 2009 and sought answers for why the Debtor did not make his payments even though his income was sufficient to make the payment. The Debtor responded that he did not make the payments because he used the proceeds from the cattle sales to first pay his expenses for his farming operation.

### III.

PEB's first allegation is that the Debtor's debt under the Cattle Note should be deemed nondischargeable under section 523(a)(2)(A). Section 523(a)(2)(A) provides that a debt may be excepted from discharge if it was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To except a debt from discharge under section 523(a)(2)(A), a creditor must prove each of the following elements by a preponderance of the evidence:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
(2) the debtor intended to deceive the creditor;
(3) the creditor justifiably relied on the false representation; and
(4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Svcs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). "Whether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard." *Id.* at 281. Therefore, PEB must demonstrate that the Debtor subjectively did not intend to repay the debt. *Id.* at 281. Whether a debtor intended to repay the debt is determined by looking at the totality of the circumstances. *Id.* at 282.

In its complaint, PEB alleges that at the time the Cattle Note was executed by the Debtor, he "specifically acknowledged to Peoples Exchange Bank when he executed the Note and Security Agreement that he owned 155 head of cows and calves and that these cows did not secure any other

notes with other lenders." Complaint Filed by Peoples Exchange Bank, ¶ 11. PEB has failed to meet its burden of proof by demonstrating that the Debtor had the subjective intent to defraud PEB with these statements, which it must do by a preponderance of the evidence. Specifically, PEB has not shown that the Debtor made a false representation. It is undisputed that at the time PEB consolidated the Debtor's loan, he did in fact own more than 155 cattle. PEB also acknowledged at trial that the cattle were not encumbered by any other party's interest. Furthermore, PEB does not dispute that the proceeds from the sale of the cattle would have been insufficient to repay the Cattle Note. Therefore, at the time the notes were consolidated, there is no showing of a subjective intent to deceive, nor is there a showing that a false representation was made.

There is also no indication that the Debtor intended to deceive PEB when he obtained an extension of the Cattle Note when he made interest payments. When the first extension occurred, he still had 155 cattle, which were sufficient to cover the Cattle Note. Then, in May of 2009, he made another interest payment. At this time, PEB noted in its loan writeup that the Debtor was going to sell his assets in order to repay the note. PEB has not shown that the Debtor intended to deceive PEB during either of these transactions, or that any statement he made was false. PEB clearly knew that the Debtor was going to liquidate its collateral. The Debtor still possessed 145 head of cattle at that time, and there is no indication that he did not intend to sell the remaining cattle and repay the note, or that he made a false statement with regards to his intentions or the number of cattle he still possessed. In fact, he did sell the cattle and made an $18,500.00 payment. PEB's own documents note that he was going to "attempt" to repay the note, not that the Debtor stated that the sale would repay the note in full.

"A finding that a debt is non-dischargeable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law." *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996); *see also* 124 Cong.Rec. H11089 (Sept. 28, 1979) (statement of Rep. Edwards) *reprinted in* 1978 U.S.C.C.A.N. 5787, 6436, 6453 ("Subparagraph (A) is intended to codify current case law . . . which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law."). "Actual fraud is the type involving moral turpitude, or intentional wrong, and thus there can be no mere imputation of bad faith." *In re Anastas*, 94 F.3d at 1286. Looking at the totality of circumstances, the Debtor's statements while obtaining credit or

5

extensions were not inconsistent with a subjective intent to repay PEB. Furthermore, the Court can find no false statements made by the Debtor. Accordingly, the Court finds that the Debtor has not committed fraudulent activity that would except the debt owed to PEB from discharge under section 523(a)(2)(A).

### IV.

PEB also claims the Cattle Note debt should be deemed nondischargeable under section 523(a)(6). This section provides that a debt may be excepted from discharge if the debt results from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

Nondischargeability under 523(a)(6) requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *see also In re Markowitz*, 190 F.3d 455, 463 (6th Cir. 1999) ("Only acts done with the intent to cause injury–and not merely acts done intentionally–can cause willful and malicious injury."). Accordingly, a willful or malicious injury occurs if the debtor (1) intends to cause the consequences of his act, or (2) believes the consequences are substantially certain to result from his act. *In re Kennedy,* 249 F.3d 576, 580 (6th Cir. 2001).

To determine whether the Debtor may have harmed PEB, the Court must first determine what rights or interests PEB held under the parties' security agreement. The security agreement provides the following under the heading "Collateral Description": "Security Agreement of even on 155 head of mixed breed cows and calves and all farm equipment currently owned and hereafter acquired by Thadd Taylor." Commercial Security Agreement dated February 14, 2007. The collateral also includes "[a]ll proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section . . . ." *Id.*

Therefore, the security agreement granted PEB rights in 155 head of mixed breed cows and calves and any proceeds from the sale of the 155 cattle. Although at trial PEB claimed the collateral was all of the Debtor's cattle, the security agreement clearly provides that it is limited to 155 head. Because the security agreement does not specify which particular cattle PEB held a security interest

in, the Court must determine to which cattle PEB's security interest attached. Absent any information that it was to attach to particular cattle, and there being no other reasonable manner to determine attachment, the Court finds that PEB's interest attached to the last 155 cattle sold by the Debtor. Later, when the Debtor sold the last 155 head of cattle, PEB's security interest attached to the sales proceeds. Accordingly, to determine the extent of PEB's interest in the sales proceeds, the Court must trace the sales of the last 155 cattle and determine the amount received at their sale.

The Debtor sold 8 head of cattle on April 6, 2009 for $4,130.86; 87 head of cattle on May 27, 2009 for $36,064.70; 55 head of cattle on July 11, 2009 for $25,062.53; and 3 head of cattle on September 23, 2009 for $1,126.26. These sales total 153 head of cattle sold for $66,384.35. This figure does not represent PEB's full interest in the sales proceeds because it is for only 153 head of cattle.

However, on March 24, 2009, the Debtor also sold 67 head of cattle for a total of $33,032.84. By dividing the total sales price of the 67 cattle, the Debtor received approximately $493.00 per head. Multiplying this figure by the two cattle PEB held a security interest in, PEB held a security interest in $980.00 of the proceeds from the March 24, 2009 sale. Adding this amount to the amount received for the 153 other head of cattle, PEB's security interest attached to proceeds from the sale of the 155 cattle in the amount of $67,364.35.

The Debtor therefore began liquidating PEB's collateral on March 24, 2009 when he sold the first two cattle of the 155 PEB held a security interest in. From this date on, the Debtor made a payment to PEB on May 29, 2009 of $1,853.49. He also made a subsequent payment on September 31, 2009 of $18,500.00. Subtracting these amounts from the $67,364.35 of sales proceeds owed to PEB, the Debtor still owed PEB $47,010.86 under the security agreement. The question now is whether the Debtor desired to harm PEB by not remitting the proceeds, or believed that harmful consequences were substantially certain to result by not doing so.

The Debtor testified at trial and at his deposition that he knew PEB held a security interest in 155 head of cattle. Furthermore, PEB's Renewal/Refinance Processing Request dated May 29, 2009 shows that the Debtor planned to liquidate his assets in order to attempt to pay off the Cattle Note. The Debtor therefore not only knew PEB had a security interest in the cattle, but also that

PEB expected him to remit the proceeds in order to attempt to pay off the note. The Processing Request also demonstrates that the sales were unlike prior sales, where the Debtor sold the cattle and retained some of the proceeds for himself and to cover expenses. The final sales were to be made in an attempt to pay off the Cattle Note. Because PEB held a security interest in the final 155 head of cattle, the Debtor was required to remit 100% of the sales proceeds to PEB. Nothing in the security agreement provides otherwise.

The Debtor, however, only remitted a portion of the proceeds, and retained $47,010.86. Because the Debtor knew PEB had a security interest in the cattle and that the proceeds were to be remitted to PEB, the Court finds that he intended to harm PEB by using them for other expenses. At the very least, the Debtor must have believed, because he had no other cattle that could serve as PEB's collateral, that harmful consequences were substantially certain to result by not remitting the full amount of the proceeds. Therefore, the Debtor has committed a harmful and malicious injury.

V.

Having determined that the Debtor did not deliberately and intentionally make misstatements to PEB, section 523(a)(2)(A) does not except the debt owed to PEB from discharge. However, the Court does find that the Debtor willfully and maliciously injured PEB by retaining sales proceeds in the amount of $47,010.86 which he knew were to be remitted to PEB under the Cattle Note. A separate order will be entered in accordance with the foregoing, excepting from the Court's discharge order $47,010.86 of the debt owed to PEB as nondischargeable under section 523(a)(6).

COPIES TO:

Matthew S. Goeing, Esq.
David A. Franklin, Esq.
Jason C. Rapp, Esq

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Joseph M. Scott, Jr.*
**Bankruptcy Judge**
**Dated: Friday, March 04, 2011**
**(jms)**